**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| ANITHIA RHODES, | * |
| Plaintiffs, | * |
| v. | * Case No.: PWG-12-3172 |
| MONTGOMERY COUNTY, MARYLAND, | * |
| Defendants. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION[1]**

Plaintiff has brought this failure-to-accommodate claim under the Americans with Disabilities Act against Defendant, her employer, alleging that she was discriminated against on the basis of a disability when she was denied a particular position on the basis of a failed background investigation and, instead, was placed in a similar position that she found less desirable. According to Plaintiff, the failed background investigation was a mere pretext and her current job provided less desirable conditions of employment. Defendant has moved for summary judgment arguing, *inter alia*, that the position offered to Plaintiff was a reasonable accommodation and presenting evidence to show that the pay and benefits that Plaintiff has received are identical to those she would have received in her desired position. Because Plaintiff does not dispute the facts presented by Defendant, I grant Defendant's motion.

---

[1] This Memorandum Opinion disposes of Defendant Montgomery County, Maryland's Motion for Summary Judgment ("Def.'s Summ. J. Mot."), ECF No. 34, and supporting Memorandum ("Def.'s Summ. J. Mem."), ECF No. 34-1; Plaintiff Anithia Rhodes's Opposition ("Pl.'s Summ. J. Opp'n"), ECF No. 35; and Defendant's Reply ("Def.'s Summ. J. Reply"), ECF No. 36.

**I.     BACKGROUND**

When considering a motion for summary judgment, the court must view "the evidence and all reasonable inferences therefrom in favor of the nonmovant." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 460 (4th Cir. 2012).  In this case, despite Plaintiff's protestations to the contrary, there are no disputed material facts.[2]

Prior to 2009, Plaintiff Anithia Rhodes was employed as a correctional officer with the Montgomery County Department of Corrections and Rehabilitation Services ("MCDCR").  Am. Compl. ¶ 1, ECF No. 23; Answer ¶ 1, ECF No. 25.  On September 24, 2009, Rhodes suffered an injury during a training exercise, after which she was unable to return to her normal duties as a correctional officer.  Am. Comp. ¶¶ 11–12; Answer ¶¶ 11–12.  It appears from the record that Rhodes was not able to work at all between September 2009 and either October or November 2010.  *See* Rhodes Aff. ¶ 2, Pl.'s Mot. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Summ. J. Opp'n") Ex. A, ECF No. 35-2 (stating that Rhodes began a light duty assignment in October 2010).

According to the collective bargaining agreement (the "CBA") between Defendant Montgomery County, Maryland (the "County") and the Municipal & County Government Employees Organization, United Food and Commercial Workers, Local 1994 ("MCGEO"), where an "employee is temporarily unable to perform his/her normal duties due to medical reasons," CBA § 33.2, Def.'s Mem. of Grounds and Auths. in Supp. of Def.'s Mot. for Summ. J.

---

[2] Plaintiff maintains that there are disputes as to whether she requested a "permanent light duty" assignment, whether her application for her desired position was subjected to unjustified delays, whether she ever was notified that she did not receive that position, and whether Defendant improperly withheld documents during discovery.  Pl.'s Summ. J. Opp'n 3.  Because none of these issues are material to whether the position that Plaintiff actually received constituted a reasonable accommodation, there is no need to address or resolve these disputes.

("Def.'s Summ. J. Mem.") Ex. 1, ECF No. 34-2, she might be placed on "Light Duty," which is "[a] temporary assignment of alternative work that an employee is qualified and able to perform when the employee is temporarily unable to perform his/her duties due to medical reasons," CBA § 33.1. Because of her injury, Rhodes was placed on a light duty assignment in the Montgomery County Pretrial Supervision Department beginning either in October or November 2010. *See* Rhodes Aff. ¶ 2 (stating that the assignment began in October); Am. Compl. ¶ 13 (alleging that the assignment began in November). The CBA provides that "[l]ight duty work assignments will not exceed 6 months," after which "the Employee Medical Examiner shall also recommend whether a reasonable accommodation or other administrative action should be pursued." CBA § 33.3(j).

At some point in the spring of 2011, Rhodes was informed that her light-duty assignment would end on April 11, 2011, and was advised that if she could not return to her normal duties by that date, she should contact Ricky Wright, the Disability Program Manger in Occupational Medical Services, in the County's Office of Human Resources ("OHR"). Rhodes Aff. ¶ 2–3; Wright Aff. ¶ 4. On March 14, 2011, Rhodes requested that she be given additional time in a light-duty assignment until a medical appointment on May 17, 2011, Letter from Anithia Rhodes to Ricky Wright (March 15, 2011), Pl.'s Summ. J. Opp'n Ex. B1, ECF No. 35-3,[3] but her request was not granted.

---

[3] In her Opposition, Rhodes claims that this exhibit, as well as several other communications provided to her by Wright, "were not disclosed by the Defendant" in response to discovery requests, which "depict[s] a flagrant disregard for the Rules 26 of the Federal Rules of Civil Procedure." Pl.'s Summ. J. Opp'n 3. The County responds that the emails provided by Wright never were sought in Rhodes's discovery requests and, in any event, were procured by an allegedly improper contact between Rhodes and Wright without the authorization of defense counsel. Def.'s Summ. J. Reply 4–6 & nn. 3–4. Because discovery in this case closed on March 7, 2014, Scheduling Order, ECF No. 33, and Rhodes has not filed a motion to compel or otherwise informed the Court of any objections to Defendant's discovery responses, she cannot

On April 19, 2011, Rhodes applied for several vacant positions that she would have been able to perform with her disability, Rhodes Aff. ¶ 5, and informed Wright about her applications on April 20, 2011, *id.* ¶ 6. Based on the CBA with MCGEO, Rhodes's applications would be given high priority because "disability priority placement trumps [reduction in force] priority" for hiring purposes. Email from Joseph Adler to Ricky Wright et al. (May 9, 2011, 18:25 EST), Pl.'s Summ. J. Opp'n Ex. B3, ECF No. 35-5.

On April 28, 2011, Rhodes met with Wright to discuss her employment options and was given a list of vacancies for which she appeared to be qualified. Rhodes Aff. ¶ 7. Of the vacancies on that list, Rhodes selected job posting IRC1868 as her first choice, *id.*, an Office Services Coordinator ("OSC") position within the police department (the "Police OSC Position"). Job Posting, Def.'s Summ. J. Mem. Ex. 3, ECF No. 34-4. One reason why Rhodes wanted this particular position was her belief that by "taking the position within the Police department . . . [she] would be able to keep [her] benefits." Rhodes Aff. ¶ 7. Although Rhodes avers that she "was never told [she] needed to submit to a background investigation" and "noted that no background was required" for that position, *id.*, the Job Posting provided as an exhibit to the Defendant's Summary Judgment Memorandum clearly states that "[a]ll positions in

---

now raise any objections to their adequacy—much less do so in her opposition to summary judgment. *See* Loc. R. 104.8 (requiring motions to compel to be filed within thirty days of receiving a discovery response). On the other hand, although Md. Lawyers' Rule of Prof'l Conduct 4.2 prohibits a *lawyer* from initiating unauthorized contact with a represented party, that rule does not prohibit parties to contact one another, with or without authorization, as apparently occurred here, *see* Md. Lawyers' Rule of Prof'l Conduct 4.2 cmt. 2 ("parties to a matter may communicate directly with each other"). There is no basis to penalize either party or to find that Exhibits B1 through B6 to Plaintiff's Opposition were withheld or obtained improperly.

Police . . . require a comprehensive background investigation and/or a drug and alcohol screen," Job Posting 2.[4]

At this point, Rhodes details a pattern of alleged delay and subterfuge that, according to her, was aimed at ensuring that she did not receive the Police OSC Position. On May 4, 2011, Rhodes was urged to consider other positions even though she had not received a response to her application for the Police OSC Position and, that afternoon, was asked if she could come in for an interview on less than two hours' notice. Rhodes Aff. ¶ 8. At her interview, Rhodes claims that she was asked about other positions and shifts for which she had not applied. *Id.* ¶¶ 9–10. However, Rhodes was offered the Police OSC Position contingent upon passing a background investigation. Walker Aff. ¶ 8, Def.'s Summ. J. Mem. Ex. 4, ECF No. 34-5. Rhodes heard nothing over the next few weeks even as she began to run out of paid leave time. *Id.* ¶¶ 12–13.[5] Finally, Rhodes was contacted on May 26, 2011 to begin her background check; her background check materials were submitted on May 27, 2011. *Id.* ¶¶ 14–15.[6] Rhodes did not anticipate any

---

[4] Exhibit C to Plaintiff's Opposition appears to be an excerpt of the Job Posting that the County has provided as Exhibit 3 to its Memorandum. *See* Job Posting Excerpt, Pl.'s Summ. J. Opp'n Ex. 3, ECF No. 35-9. Notably, this excerpt omits the second page of the posting, where the statement that a background investigation may be required for police department positions appears.

[5] Patricia Walker of the Montgomery County Police Department has represented that "[b]ackground investigations generally take around five weeks to complete, but may take longer," and that "[i]n Ms. Rhodes' case, there was a delay in starting Ms. Rhodes' background investigation due to the MCPD's workload and Ms. Rhodes' unavailability." Walker Aff. ¶¶ 9–10.

[6] The County argues that Rhodes's affidavit cannot be relied upon on this point because both the Amended Complaint and Rhodes's answers to interrogatories stated that she submitted her background investigation packet on July 5, 2011. Def.'s Summ. J. Reply 8. Because Rhodes is the non-movant in the context of this summary judgment motion, and in any event, the precise date on which Rhodes submitted her packet is not material to the resolution of this action, I will rely upon her representations in her affidavit and need not consider whether the "sham affidavit

problems with her background investigation as she had routinely passed periodic investigations during her time employed with MCDCR. *Id.* ¶ 22. Despite at least one attempt to follow up, Rhodes heard no response until July 18, 2011, when she met with the background investigator to provide fingerprints and was informed that the investigation would be completed by July 20, 2011. *Id.* ¶¶ 17–18.

On July 27, 2011, Wright contacted Rhodes to inform her that that there were problems with her background investigation. *Id.* ¶ 19. According to Assistant Chief Luther Reynolds, who would have been Rhodes's immediate supervisor in the Police OSC Position, Rhodes was considered unsuitable for the position because she "had immediate family members residing with her with significant contacts with the law." Reynolds Aff. ¶ 12, Def.'s Summ. J. Mem. Ex. 8, ECF No. 34-9. Rhodes acknowledges that her spouse has a criminal history. *See* Pl.'s Opp'n 11 ("Plaintiff has always been candid in disclosing that her spouse had a criminal history."). Rhodes repeatedly asked Wright about the status of the Police OSC Position, but did not receive any response, *see* Rhodes Aff. ¶¶ 20–21, 25–26, and she maintains that she never was informed officially that she had not received the Police OSC Position, *see* Am. Compl. ¶ 31, ECF No. 23. At the very least, the documentary evidence suggests that there may have been miscommunications over who was to inform Rhodes that she did not receive the Police OSC Position. *See* Email from Jacqueline LaRocca to Melissa Davis et al. (Jan. 31, 2012, 12:13 EST), Pl.'s Summ. J. Opp'n Ex. B5, ECF No. 35-7.

In August 2011, Rhodes received an interview for an OSC position in the Office of Human Resources (the "OHR OSC Position"), which she accepted on August 16, 2011. Rhodes Aff. ¶¶ 20, 23. At the time, Rhodes believed that the OHR OSC Position was only temporary

---

doctrine" applies here. *Cf. Zimmerman v. Novartis Pharm. Corp.*, 287 F.R.D. 357, 362 (D. Md. 2012).

because she had not heard otherwise, and she only accepted the position because she had almost exhausted her donated leave and would lose her health coverage through the County otherwise. *Id.* ¶ 23. As of at least April 2014, Rhodes remained employed in the Office of Human Resources in Montgomery County, Beckley Aff. ¶ 11, Def.'s Summ. J. Mem. Ex. 9, ECF No. 34-10, and it appears from the record that she remains in the OHR OSC Position.

Although she remains employed, Rhodes contends that being placed in the OHR OSC Position instead of the Police OSC Position constitutes employment discrimination for several reasons. First, Rhodes argues that, although Montgomery County policies require that she keep the same salary for two years after being reassigned due to her disability, after the end of two years, "the department director must downgrade the 'disabled' employee's base salary to the maximum for that pay grade of that employee's position." Pl.'s Summ. J. Opp'n 7; *see also* Regulations Excerpt, Pl.'s Summ. J. Opp'n Ex. D, ECF No. 35-10. Although Rhodes was compensated at grade 22 in MCDCR, the OHR OSC Position placed her at grade 16. *See* Rhodes Aff. ¶ 27; Pl's Resp. to Def.'s First Interrogs. ¶ 13, Pl.'s Summ. J. Opp'n Ex. E, ECF No. 35-11.

However, Rhodes acknowledges that, despite her concerns, she received several salary increases in 2012 and 2013, including a temporary 10% increase from October 2012 to July 2013 and a 3.5% increment in July 2013 along with a separate promotion that did not come with a pay increase. Rhodes Aff. ¶¶ 28–29. Kaye Beckley of OHR has provided an affidavit providing some more precise figures. First, Beckley explains that Rhodes's original salary of $55,612 in MCDCR was within the range provided for an OSC of grade 16 (which went up to $61,498), so that her salary would not have been reduced as a result of the decrease in grade. 2d Beckley Aff. ¶¶ 7, 9, Def.'s Reply to Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Def.'s Summ. J. Reply") Ex.

2, ECF No. 36-2. Beckley further avers that Rhodes actually received an increase in her pay grade due to a reclassification of the OHR OSC Position, *id.* ¶ 7, which resulted in her receiving her 3.5% "service increment" in July 2013, nearly a year prior to when she otherwise would have been eligible for that increase, as well as a "general wage adjustment" under the MCGEO CBA in 2013. *Id.* ¶ 10. As of May 2014—nearly three years after Rhodes took the OHR OSC Position and well outside of the two years during which her original salary was protected by the CBA—Rhodes did not provide any testimony or evidence that her salary actually had been decreased. *See, e.g.*, Rhodes Aff. (dated May 9, 2014).

Rhodes also argues that she lost several fringe benefits, including union representation and the union retirement benefits that would have allowed her to retire earlier. Pl.'s Resps. to Def.'s First Interrogs. ¶ 13. However, this appears to rest on a comparison between the OHR OSC Position and Rhodes's original position in MCDCR. *See id.* ¶¶ 13–14. Beckley has stated that both positions provided identical benefits, that neither would have classified Rhodes as a "public safety employee," and both would have placed her within the same County-administered benefit plan. 1st Beckley Aff. ¶¶ 8–10, Def.'s Summ. J. Mem. Ex. 9, ECF No. 34-10. In addition, the MCGEO CBA, of its terms, appears to cover office employees, *see* MCGEO CBA § 1.2, *available at* http://www.mcgeo.org/docs/contracts/MoCo_CBA_2013_2016.pdf (last visited Jan. 12, 2015), and Rhodes has not provided any evidence or testimony to show that she no longer is represented by MCGEO.

Rhodes initially filed her complaint in this Court on October 27, 2012 against MCDCR, Ricky Wright, the Montgomery County Police Department ("MCPD"), and Captain Patricia Walker in the MCPD, alleging one count for discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, for failure to provide reasonable

8

accomodations, and one count for retaliation under the ADA and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Compl., ECF No. 1.[7] Defendants moved to dismiss on December 20, 2012, Defs.' Mot. to Dismiss, or in the Alternative, for Summ. J., ECF No. 9, following which Rhodes sought leave to amend her complaint to name Montgomery County as a defendant instead of MCDCR and MCPD, Pl.'s Mot. and Mem. in Supp. for Leave to File First Am. Compl., ECF No. 16. On March 1, 2013, Judge Alexander Williams granted the motion to dismiss with respect to MCDCR, MCPD, Wright, and Walker, and with respect to Rhodes's retaliation claims, but allowed her to amend her complaint to name Montgomery County as a proper defendant with respect to her discrimination claim. *Rhodes v. Montgomery Cnty. Dept. of Corr. and Rehabilitation*, No. AW-12-3172, 2013 WL 791208 (D. Md. March 1, 2013). This case was reassigned to me in November 2013 and discovery closed on March 7, 2014. Order, ECF No. 33.

On April 28, 2014, the County filed its Motion for Summary Judgment ("Def.'s Mot. for Summ. J."), ECF No. 34, with a supporting Memorandum, Def.'s Summ. J. Mem., ECF No. 34-1. Rhodes filed an Opposition, Pl.'s Summ. J. Opp'n, ECF No. 35, and the County has replied, Def.'s Summ. J. Reply, ECF No. 36. The motion now is ripe and is before me. Having reviewed the filings, I find a hearing is not necessary. Loc. R. 105.6.

## II. STANDARD OF REVIEW

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

---

[7] Judge Alexander Williams already has found that Rhodes properly exhausted her administrative remedies as required by the A.D.A. and Title VII. *See Rhodes v. Montgomery Cnty. Dept. of Corr. and Rehabilitation*, No. AW-12-3172, 2013 WL 791208, at *7 (D. Md. March 1, 2013).

other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317, 325 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* "[U]nder Fed. R. Civ. P. 56, as amended in 2010, facts in support of or opposition to a motion for summary judgment need not *be* in admissible form; the requirement is that the party identify facts that *could be* put in admissible form." *Mallik v. Sebelius*, 964 F. Supp. 2d 531, 546 (D. Md. Aug. 28, 2013) (citing *Niagara Transformer Corp. v. Baldwin Techs., Inc.*, No. DKC-11-3415, 2013 WL 2919705, at *1 n.1 (D. Md. June 12, 2013)).

## III.   DISCUSSION

The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). An employer discriminates against a qualified individual by, *inter alia*, "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodations to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5)(A). A "'reasonable accommodation' may

include . . . job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). As Judge Williams noted earlier in this case, "[t]he only conceivable basis for Rhodes's discrimination claim is that Defendants failed to provide her with reasonable accommodation" when she was not given the Police OSC Position and, instead, had to settle for the OHR OSC Position. *See Rhodes*, 2013 WL 791208, at *8.

To make out a prima facie failure-to-accommodate case, a plaintiff must show "'(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . .; and (4) that the [employer] refused to make such accommodations." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (alterations and ellipsis in original) (citation omitted). It is not disputed that Rhodes is disabled or that the County was aware of her disability.

"Independently of the undue hardship requirement, an employer is required to make only those accommodations that are 'reasonable.'" *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 353 (4th Cir. 2001). "The employer need not have 'provided the specific accommodation requested . . ., or even . . . provided the best accommodation, so long as the accommodation . . . is reasonable." *Reyazuddin v. Montgomery Cnty., Md.*, 7 F. Supp. 3d 526, 549 (D. Md. 2014) (ellipses in original) (citations omitted).

> In order to be reasonable, the accommodation must be effective (i.e. it must address the job-related difficulties presented by the employee's disability), and it must allow the employee to attain an 'equal' level of achievement, opportunity, and participation that a non-disabled individual in the same position would be able to achieve.

*Fleetwood v. Harford Sys., Inc.*, 380 F. Supp. 2d 688, 699–700 (D. Md. 2005) (citing *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F. Supp. 720, 736 (D. Md. 1996)). "However, '[a]n

employer is not obligated to provide an employee the accommodation he or she requests or prefers; the employer need only provide some reasonable accommodation.'" *Crawford v. Union Carbide Corp.*, 202 F.3d 257, 1999 WL 1142346, at *4 (4th Cir. Dec. 14, 1999) (quoting *Baert v. Euclid Beverage, Ltd.*, 149 F.3d 626, 633 (7th Cir. 1998) (alteration in original)).

"Reassignment is an acceptable form of accommodation, but has traditionally been seen as an 'accommodation of last resort,' that does not arise unless accommodation within the employee's current position would pose an undue hardship." *Reyazuddin v. Montgomery Cnty., Md.*, 7 F. Supp. 3d 526 (D. Md. 2014). In this case, the parties appear to have agreed that Rhodes could not perform her original job, even with an accommodation, *see* Rhodes Aff. ¶ 3 ("I was unable to return to full duty work assignment as a Correctional Officer."), and that reassignment therefore was necessary.

Further, Rhodes has acknowledged, in principle, that a transfer to a grade 16 OSC position would have been a reasonable accommodation. *See generally* Pl.'s Opp'n (arguing that Rhodes should have been given the Police OSC Position); *see also* Job Posting (listing the Police OSC Position as grade 16). Indeed, the gravamen of her complaint is not that she was not permitted to continue employment as a correctional officer in MCDCR, but that she was discriminatorily denied the Police OSC Position. The mere fact that Rhodes would have preferred to work in MCPD rather than in OHR is not a sufficient basis for finding that the OHR OSC Position was not a reasonable accommodation. *See Crawford*, 1999 WL 1142346, at *4. Rather, Rhodes claims that the OHR OSC Position was not a reasonable accommodation because, as compared to the Police OSC Position, (1) her salary would be reduced and (2) she would lose her status as a public safety employee and be transferred to a less desirable, civilian benefits plan. *See* Pl.'s Opp'n 7.

Rhodes's subjective concerns about her salary are controverted by the record. First, the Second Beckley Affidavit explains that Rhodes's salary was within the range for a grade 16 OSC and Beckley has averred that Rhodes would not have been subject to a salary reduction because of the change in her grade. *See* 2d Beckley Aff. ¶ 9. Rhodes has not disputed these facts, but states only that she was "concerned about the decrease in [her] salary." Rhodes Aff. ¶ 29. But even these mere concerns lack any factual basis, as Rhodes has acknowledged that her salary actually increased in the OHR OSC Position. *Id.* And the County has provided documentary support showing that Rhodes's salary grade has increased from 16 to 18 and her salary increased from $55,612 in December 2010 to $59,429.07 in September 2013. Personnel Action Form, Def.'s Summ. J. Reply Ex. 3, ECF No. 36-3. Rhodes cannot dispute that her salary in the OHR OSC Position was commensurate with or greater than her prior salary at all relevant times, and she has not produced any evidence to suggest that she would have fared better in the Police OSC Position.

The County also has put forth uncontroverted evidence that neither the Police OSC Position nor the OHR OSC Position would have classified Rhodes as a public safety employee or allowed her to continue participating in the "EK" retirement plan for public safety employees. *See* 1st Beckley Aff. ¶¶ 8–10. According to Beckley's affidavit, both positions provide benefits under the County's "AK" benefit plan for civilian employees. *Id.* ¶ 10. Although Rhodes objects that this is not the same plan that she participated in while employed in MCDCR, *see* Pl.'s Resps. to Def.'s First Interrogs. ¶¶ 13–14 (comparing her status in the OHR OSC Position to that in her prior position in MCDCR), that is not the relevant question because Rhodes is not arguing she was discriminated against when she was not allowed to continue working as a correctional officer. Rather, the reasonableness of the OHR OSC Position must be judged in

13

comparison to the Police OSC Position because Rhodes acknowledges that the Police OSC Position was a reasonable accommodation. Any position offering similar status, pay, and benefits, *a fortiori*, also must be reasonable.

Because the OHR OSC Position in which Rhodes was placed was a reasonable accommodation, it matters not whether the County or its employees acted improperly—or simply callously—in declining to offer Rhodes the Police OSC Position. Nor does it matter whether the County's assertion that Rhodes failed her background check was pretextual.[8] And Rhodes's claim that the OHR OSC Position was created "as a way to cover up the fact that the entire process of selection for the OSC Police position was handled in a manner that lacked of integrity and respect," Rhodes Aff. ¶ 30, is utterly beside the point. The undisputed facts show that Rhodes was offered, and accepted, a position that constituted a reasonable accommodation and, as a result, she remains employed by the County at a higher salary than she had been receiving when she initially became disabled. This cannot support a prima facie case for failure-to-accommodate, and therefore the County is entitled to judgment in its favor as a matter of law.

---

[8] It is worth noting that, although Rhodes claims that the failed background investigation was used as a pretext for not placing her in the Police OSC Position, she does not dispute the finding that she "had immediate family members residing with her with significant contacts with the law." Reynolds Aff. ¶ 12, Def.'s Summ. J. Mem. Ex. 8, ECF No. 34-9. Rather, she argues only that the relevant criminal offense should not have served to disqualify her from employment with the police department. Pl.'s Summ. J. Opp'n 12. But "this Court 'does not sit as a kind of super-personnel department weighing the prudence of employment decisions,'" *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997)), so whether the background investigation *should* have disqualified Rhodes from the Police OSC Position is immaterial.

## IV. CONCLUSION

For the aforementioned reasons, Defendant's Motion for Summary Judgment will be GRANTED.

A separate order shall issue.

Dated: <u>January 13, 2015</u>                                                  /S/
                                                                             Paul W. Grimm
                                                                             United States District Judge

dsy